UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NAVANA LOGISTICS LIMITED,

                              Plaintiff,                    15-cv-856 (PKC)

            -against-                                       MEMORANDUM
                                                            AND ORDER

TW LOGISTICS, LLC, SHLOMO
GREENBERG, JDE ASSOCIATES LLC,
ISRAEL DISCOUNT BANK OF NEW YORK,

                              Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

            This action is brought by Navana Logistics Limited ("Navana"), a self-described
"freight-forwarder," who sues in contract, unjust enrichment, and various other grounds for the
purchase price of garments sent from Chittagong, Bangladesh to the port of Los Angeles.
Defendant JDE Associates, LLC ("JDE") purchased those garments from various suppliers.  JDE
rejected some of the goods shipped, but no payment has been made for any of the goods.  Letters
of credit, issued by defendant Israel Discount Bank of New York ("Israel Discount Bank"), with
the suppliers as beneficiaries, have not been honored.  At least one of the suppliers has sued
Navana in a court in Bangladesh.

            The suppliers, who have moved to intervene in this action, may have a raft of
claims against the various defendants named here, including TW Logistics, LLC ("TWL") and
Shlomo Greenberg, and may also have claims against Navana.  But, Navana does not plausibly
allege that it has any claim in its own right against any of the four defendants.  At most, Navana
was an agent for disclosed principals—the suppliers.  However, Navana cites no language in any
agreement and no principle of law that grants Navana the right to sue on behalf of the suppliers.

Defendants TWL, Greenberg, and Israel Discount Bank move to dismiss or for judgment on the pleadings on various grounds. TWL and Greenberg also filed cross-claims for indemnification and contribution against JDE and for contribution against Israel Discount Bank. Defendant JDE has not appeared in this action. For reason that will be explained, the defendants' motions to dismiss are granted.

BACKGROUND

For the purposes of defendants' motion, all non-conclusory factual allegations are accepted as true, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and all reasonable inferences are drawn in favor of the plaintiff as the non-movant, see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

I.      The Motion to Dismiss.

Navana, the plaintiff, is a "private limited company" incorporated, and with its principal place of business, in Dhaka, Bangladesh. (Second Amended Complaint ("SAC") ¶1.) Navana acted as "freight forwarder" for various unidentified garment suppliers who sold goods to JDE, one of the defendants, in an international transaction that forms the basis for this complaint.[1] (SAC ¶8.) JDE is a limited liability company with its principal place of business in New York, New York. (SAC ¶4.) In its capacity as "freight forwarder," Navana alleges it arranged for the shipment of the suppliers' goods from the port of Chittagong, Bangladesh to Los Angeles, California. (SAC ¶¶8, 13).

---

[1] "Freight forwarders are intermediaries usually employed by a shipper or exporter to facilitate and handle the details of shipment of goods." 1 T. Schoenbaum, Admiralty & Mar. Law § 10-7 (5th ed. 2015). The Second Circuit has described the duties of freight forwarders as to "provide various services in connection with the water transportation of cargo, such as moving cargo from a shipper to the pier and preparing and processing bills of lading, dock receipts, and other shipping documents". Taub, Hummel & Schnall, Inc. v. Atl. Container Line, Ltd., 894 F.2d 526, 527 (2d Cir. 1990)

TWL, another defendant, is a limited liability company with its principal place of business in Great Neck, New York.  (SAC ¶2).  According to Navana, TWL served as JDE's "destination delivery agent" in this transaction.  (SAC ¶9.)  Navana asserts that Shlomo Greenberg, a third defendant, is the sole member and owner of TWL and is a New York resident.  (SAC ¶¶3, 17).  As "destination delivery agent," TWL was allegedly responsible for ensuring that the delivered garments were released to JDE, but only after JDE provided TWL with an "Original House Bill of Lading" duly endorsed by two banks—the supplier's bank and JDE's bank.[2]  (SAC ¶21).

Israel Discount Bank, a New York corporation and the fourth defendant in this lawsuit, was engaged by JDE to act on JDE's behalf in this transaction.  (SAC ¶20).  Israel Discount Bank issued various letters of credit to facilitate JDE's garment purchases, the beneficiaries of which were the various garment suppliers.[3]  (SAC ¶20).  Navana does not name attaches Exhibit A to the SAC, which appears to name seven "shippers."  (SAC, Ex. A).

The garment suppliers who hired Navana had shipped twenty-four containers of goods to Los Angeles.  (SAC ¶9).  JDE could claim those shipments only after it presented an endorsed bill of lading.  (SAC ¶21).  According to Navana, JDE never presented any bill.  (SAC ¶25).  Instead, JDE rejected delivery of nine of the containers, even though it paid their customs

---

[2]"The traditional bill of lading is a document which is signed by the carrier or his agent acknowledging that goods have been shipped on board a specific vessel that is bound for a particular destination and stating the terms on which the goods are to be carried."  T. Schoenbaum, § 10-11; see also Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 18-19 (2004) (describing that bills of lading record "that a carrier has received goods from the party that wishes to ship them, [] states the terms of carriage, and serves as evidence of the contract for carriage").  Bills of lading can also function as "[a] formal receipt and acknowledgement that goods of a certain kind, quantity, and condition have been handed over for shipment" or as "[a] document of title to the goods themselves which enable the shipper to sell them by endorsement and delivery of the bill of lading."  T. Schoenbaum, § 10-11.

[3]A letter of credit is a "mechanism of payment" for goods shipped.  T. Schoenbaum, § 10-1.  It "is an agreement in which the bank promises to honor a draft or other demand for payment if the conditions set forth in the letter are fulfilled."  Id.  They assure that "payment will be made by the buyer to the seller under specified conditions," which usually include "the delivery of required documents such as the shipped bill of lading, invoice, and contract of insurance."  Id.

duties, and failed to pay customs duties on one other container, which is now allegedly sitting in a "General Order" warehouse controlled by US Customs.  (SAC ¶10).

The status of the remaining fourteen containers is, according to Navana, teh subject of conflicting versions of events.  Navana claims that TWL, through its principal Greenberg, informed Navana that TWL was storing the remaining fourteen containers of goods in a TWL controlled warehouse.  (SAC ¶15).  Navana alleges, however, that the information provided by TWL and Greenberg was false.  (SAC ¶15).  It asserts that TWL and Greenberg actually released the fourteen containers to JDE without first securing an endorsed bill of lading, (SAC ¶¶22, 25), and that Greenberg intentionally or negligently made false written misrepresentations to Navana as to the whereabouts of those containers, (SAC ¶27).  TWL and Greenberg also allegedly denied Navana's written request for further clarification about the location of the containers.  (SAC ¶26).

The total value of the goods shipped to JDE was $1,175,063.59 (SAC ¶43).  The ten rejected containers represent $503,404.08 worth of goods, (SAC ¶30), and the fourteen missing containers represent $671,659.51 worth of goods, (SAC ¶29).  JDE has not yet paid the garment suppliers for any of the goods shipped, (SAC ¶28), and Israel Discount Bank has not honored the letters of credit it issued on JDE's behalf, (SAC ¶53).  Thus, the various garment suppliers who employed Navana in this transaction remain uncompensated for the goods they shipped.  (SAC ¶9).

Navana's claims for damages are couched in terms of the failure of defendants to pay the purchase price of the goods, a sum owed to the suppliers, or for the reasonable value of those goods.  Navana also claims to "stand[] in the shoes of the suppliers as to the letters of credit," (SAC ¶20), because the suppliers are "looking to Plaintiff for payment for the goods that

they did not receive from Israel Discount Bank via the letters of credit." (SAC ¶53). Navana claims that one of the suppliers, Kent Garments, has filed a complaint against Navana, TWL, Greenberg, and JDE for "misappropriation" in Bangladesh. (Declaration of Showkat Akber Khondaker ("Khondaker Decl."), ¶19). Navana brings claims in breach of contract, unjust enrichment, quantum meruit, and account stated against all four defendants, claims for fraud and negligent misrepresentation against Greenberg, and claims for wrongful dishonor of letters of credit against Israel Discount Bank. JDE has made no appearance in this action and Navana has filed a motion for a default judgment as to JDE. (Dkt. 55).

II.     Motion to Intervene.

Adila Apparels, Ample Fashion Ltd., Cleartex Industries Limited, Friends & Friends Apparels Ltd., Ifco Garment and Textiles Ltd., Kent Garments Ltd., and Nazia Apparels, (the "Intervenors"), filed a motion to intervene in this action pursuant to Rule 24, Fed. R. Civ. P., claiming to be the "suppliers" referenced in Navana's complaint. The Intervenors allege that they were not made aware of, and did not authorize, Navana's lawsuit. (Intervenor's Memorandum of Law, 3). They also allege that JDE, and not the Intervenors, hired Navana to act as freight forwarder and that Navana arranged for TWL to act as the destination delivery agent. (Intervenor's Memorandum of Law, 4).

JURISDICTION

Taking Navana's properly pled allegations as true, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332(a)(2), which grants original jurisdiction to district courts for actions between "citizens of a State and citizens or subjects of a foreign state" when the amount in controversy is greater than $75,000, exclusive of interest and costs. Navana is an entity incorporated under the laws of Bangladesh, with its principal place of

business in Bangladesh, (SAC ¶1), and all four of the defendants are citizens of New York, (SAC ¶¶2-5). The amount in controversy exceeds $75,000, exclusive of interests and costs. (SAC ¶7).

APPLICABLE LAW

A federal court sitting in diversity generally should apply the choice of law principles of the forum state. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941). However, no party has addressed the issue of what substantive law should be applied in this case. Instead, all parties have relied exclusively on New York state substantive law. Under such circumstances, a court may apply the principle that "implied consent to use a forum's law is sufficient to establish choice of law." Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989). The parties' exclusive reliance on New York law is sufficient to establish implied consent to its use. See Tehran-Berkeley, 888 F.2d at 242 (applying New York law where parties did not brief or argue choice of law, but instead submitted briefs that relied on New York law). Therefore, the Court will apply New York substantive law where necessary.

DISCUSSION

I.      Legal Standard.

Defendants Israel Discount Bank, TWL, and Greenberg each move to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), Fed. R. Civ. P., and for judgment on the pleadings, pursuant to Rule 12(c), Fed. R. Civ. P. Defendants also assert several other grounds for dismissal of Navana's claims, including Rules 12(b)(7) and 17(a), Fed. R. Civ. P., which the Court need not reach. In ruling on a motion to dismiss, the Court must draw all reasonable inferences in the plaintiff's favor and accept as true all well-pleaded factual allegations in the complaint. In re Elevator Antitrust Litig., 502 F.3d at 50. The

standard for evaluating a motion for judgment on the pleadings is the same standard used to address a motion to dismiss under Rule 12(b)(6).  Karedes v. Ackerley Grp., Inc., 423 F.3d 107, 113 (2d Cir. 2005); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998).

   To survive a motion to dismiss, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 555 (2007)) (internal quotations omitted).  While Fed. R. Civ. P. Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Twombly, 550 U.S. at 555, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Id. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.  This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Id.  And, while detailed factual allegations are not necessary, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) (quotation omitted) (alteration in original).

   In addition to the general pleading requirements of Rule 8(a), Fed. R. Civ. P., a fraud-based claim must satisfy the heightened pleading requirements of Rule 9(b), Fed. R. Civ. P.: a party alleging fraud must "state with particularity the circumstances constituting fraud or mistake."  To satisfy this pleading standard, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Novak v. Kasaks,

216 F.3d 300, 306 (2d Cir.2000) (quoting <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994). Rule 9(b) pleadings cannot generally be based upon "information and belief." <u>Segal v. Gordon</u>, 467 F.2d 602, 608 (2d Cir. 1972). This rule is relaxed, however, when the allegations (i) involve "matters peculiarly within the adverse parties' knowledge" and (ii) are "accompanied by a statement of the facts upon which the belief is founded." <u>Id.</u> The malice, intent, knowledge, or other condition of mind requirements of a fraud claim "may be averred generally." Rule 9(b). But, this relaxed specificity requirement does not give plaintiffs "license to base claims of fraud on speculation and conclusory allegations." <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995). Plaintiffs must still "allege facts creating a strong inference of fraudulent intent." <u>Id.</u>

II.    Breach of Contract.

Navana alleges that all four defendants are liable for breach of contract. To establish a claim for breach of contract under New York law, a plaintiff must show: "(1) the existence of a contract between itself and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by the defendant's breach." <u>Diesel Props S.r.l v. Greystone Business Credit II LLC</u>, 631 F.3d 42, 52 (2d Cir. 2011); <u>see</u> <u>Palmetto Partners, L.P. v. AJW Qualified Partners, LLC</u>, 83 A.D.3d 804, 806, (2d Dept. 2011). But, "[l]iability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties." <u>CDJ Builders Corp. v. Hudson Grp. Const. Corp.</u>, 67 A.D.3d 720, 722 (2d Dept. 2009) (quoting <u>Hamlet at Willow Cr. Dev. Co., LLC v. Northeast Land Dev. Corp.</u>, 64 A.D.3d 85, 104 (2d Dept. 2009)). The principal question is whether Navana plausibly alleges the existence of any contract on which it could reasonably base its claim for relief. It does not.

- 8 -

Navana's contract claim fails for two reasons.  First, Navana does not show that it is a party to any contract with any of the defendants.  Second, Navana does not show that the suppliers, for whom it claims to be an agent, have assigned Navana any rights under an existing contract or otherwise authorized Navana to sue the defendants on their behalf.

    1.   A Contract between Navana and the Defendants.

Navana describes its role in this transaction as that of a "freight forwarder."  (See SAC ¶8).  Freight forwarders are "intermediaries usually employed by a shipper or exporter to facilitate and handle the details of shipment of goods."  T. Schoenbaum, § 10-7.  "The freight forwarder arranges for the ocean transportation by locating available space, handles various documentation for the shipper's goods, including preparation of bills of lading, and performs such other services as arranging for the transport of the goods to dockside."  Id.; see also Taub, Hummel & Schnall, 894 F.2d at 527 (describing the duties of freight forwarders as to "provide various services in connection with the water transportation of cargo, such as moving cargo from a shipper to the pier and preparing and processing bills of lading, dock receipts, and other shipping documents").  Freight forwarders generally do not transport the goods themselves.  T. Schoenbaum, § 10-7.  According to the SAC, various garment suppliers hired Navana to coordinate the process of shipping their goods abroad.  (SAC ¶8).  Navana does not allege that it also served as the "carrier" of the goods—the entity charged with physically transporting the suppliers' garments.

On the other side of the transaction, Navana alleges that JDE was the purchaser of the shipped goods.  (SAC ¶8).  It also alleges that that TWL, Greenberg, and Israel Discount Bank were hired by JDE.  (SAC ¶¶9, 20-21).  TWL was JDE's destination delivery agent, responsible for notifying JDE when the goods arrived, (SAC ¶¶9, 21), and Israel Discount Bank

issued letters of credit to the suppliers on JDE's behalf, (SAC ¶20).  It appears from the complaint that JDE, and not Navana or the suppliers, hired TWL and Israel Discount Bank. (SAC ¶¶9, 20, 21).

        Navana fails to plausibly allege in any non-conclusory manner the existence of any contract between itself and any of the defendants.  It employs the language of a claim of "breach of contract," but never identifies a contract with Navana that a named defendant breached.  There is adequate factual content supporting the inference that a contract for the sale and purchase of goods existed between the suppliers and JDE, but Navana fails to allege any facts "show[ing]" that Navana was a party to that contract.  Rule 8(a).

        Navana does allege the existence of certain "bills of lading," but fails to plausibly allege how those bills could represent a contract between itself and TWL, Greenberg, Israel Discount Bank, or JDE.  A bill of lading "is a document which is signed by the carrier or his agent acknowledging that goods have been shipped on board a specific vessel that is bound for a particular destination and stating the terms on which the goods are to be carried."  T. Schoenbaum, § 10-11.  Bills of lading often function as contracts in maritime shipping transactions between suppliers of goods and common carriers, see Kirby, 543 U.S. at 18 (characterizing certain bills of lading as maritime contracts), but can also serve as "[a] formal receipt and acknowledgement that goods of a certain kind, quantity, and condition have been handed over for shipment" or as "[a] document of title to the goods themselves which enable the shipper to sell them by endorsement and delivery of the bill of lading."  T. Schoenbaum, § 10-11 (describing the three possible functions of a bill of lading).

        For example, in Norfolk S. Ry. Co. v. Kirby, the Supreme Court described a maritime transaction where a manufacturer hired a freight forwarder to coordinate a shipment of

its goods from Australia to Georgia.  543 U.S. at 19-20.  That freight forwarder issued the manufacturer certain bills of lading formalizing their contract of carriage.  <u>Id.</u>  Having been hired by the manufacturer, and because the freight forwarder does not actually ship goods itself, the freight forwarder in turn hired an ocean shipping company to transport the goods.  <u>Id.</u> at 21.  That shipping company then issued its own bills of lading to the freight forwarder formalizing their contract of carriage.  <u>Id.</u>

The bills of lading alluded to in the SAC do not plausibly represent a contract between Navana and TWL, Greenberg, or Israel Discount Bank.  Navana first references certain bills when it states "pursuant to various bills of lading, Plaintiff acted as freight forwarder in connection with the carriage of goods . . . on behalf of suppliers/shippers."  (FAC ¶8).  These particular bills could only be understood as setting forth a carriage contract between Navana and the various suppliers, with Navana acting as freight forwarder for garments the suppliers wanted to ship abroad.

Navana's other two references to bills of lading fair no better.  First, Navana alleges that JDE had to present an "Original House Bill of Lading" to TWL prior to receiving the goods.  (SAC ¶21).  Second, Navana alleges that it, "as freight forwarder nominated by TWL, arranged for the issuance of the subject bills of lading on behalf of TWL at the request of JDE . . . through its agent, TWL."  (SAC ¶41).  While the second reference is somewhat cryptic, both allegations, taken at face value, refer to the same bills of lading—bills which JDE needed to present to TWL before JDE could collect the goods.  Thus, the statement of claim in the SAC does not plausibly "show[]" that these bills represent contracts between any parties.  Rule 8(a).  Instead, the allegations "show[]" that the bills functioned as receipts for the goods or documents

of title, the presentation of which would be necessary to finalize payment on certain letters of credit.  Rule 8(a); <u>See</u> T. Schoenbaum, § 10-11.

In sum, Navana does not plausibly allege the existence of any contract between itself and TWL, Greenberg, Israel Discount Bank, or JDE, and the various bills of lading Navana offhandedly references throughout the SAC do not represent any such contract.

2.   A Contract Claim Based on Agency or Assignment Principles.

Generously read, the SAC alleges that Navana acted as an agent of the suppliers and that, as their agent, it is bringing this breach of contract claim.  However, even if an agency relationship did exist between Navana and the suppliers, Navana fails to plausibly allege that it entered into any contract with TWL, Greenberg, or Israel Discount Bank or that Navana, as agent of the suppliers, was an assignee of any contract or that it had authority from the suppliers to sue on their behalf.

Under New York law, an agency relationship exists where there is "consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." <u>Time Warner City Cable v. Adelphi Univ.</u>, 27 A.D.3d 551, 552 (2d Dept. 2006) (quoting <u>Maurillo v. Park Slope U–Haul</u>, 194 A.D.2d 142, 146 (2d Dept. 1993)) (internal quotations omitted).  The principal's control over the agent is critical to the formation of an agent-principal relationship: a "principal retains control over the conduct of the agent with respect to matters entrusted to the agent, and the agent acts in accordance with the direction and control of the principal."  <u>William Stevens, Ltd. v. Kings Vill. Corp.</u>, 234 A.D.2d 287, 288 (2d Dept. 1996); <u>see also</u> <u>L. Smirlock Realty Corp. v. Title Guarantee Co.</u>, 70 A.D.2d 455, 464, (2d Dept. 1979) *aff'd as modified* 52 N.Y.2d 179 (1981).  Navana fails to plead any facts showing the existence of an agency relationship between itself and the various garment suppliers.

- 12 -

Nevertheless, because the "precise status of a [freight] forwarder is a matter which is not free from doubt," Koninklijke Nedlloyd BV v. Uniroyal, Inc., 433 F. Supp. 121, 128 (S.D.N.Y. 1977), the Court assumes, for the sake of this motion, that Navana is, in some capacity, the agent of the suppliers.  But see Farrell Lines Inc. v. Titan Indus. Corp., 306 F. Supp. 1348, 1350 (S.D.N.Y. 1969) aff'd sub nom. Farrell Lanes Inc. v. Titan Indus. Corp., 419 F.2d 835 (2d Cir. 1969) (holding that a "freight forwarder" was an independent contractor and not an agent because "the critical elements of control and exclusivity" were absent); Nat'l Shipping Co. of Saudi Arabia, 02 cv 100 (HB), 2003 WL 22990096, at *5 (S.D.N.Y. Dec. 19, 2003) (holding the same); Koninklijke Nedlloyd BV, 433 F. Supp at 128 (holding the same).

Even assuming Navana was an agent of the suppliers, Navana still fails to plausibly allege that it entered into any contract as agent for the alleged principals.  Nor does Navana allege facts showing that the suppliers assigned Navana their rights under any purported contract with the defendants or gave Navana authority to sue on the suppliers' behalf.  "A person making or purporting to make a contract with another as an agent for a disclosed principal does not become a party to the contract absent an agreement or indication to that effect."  2A N.Y. Jur. 2d, Agency and Independent Contractors § 330; see Shilman v. United States, 164 F.2d 649, 653 (2d Cir. 1947).   "It is also well settled that an agent cannot maintain an action on a contract in his own name on behalf of his principal unless he is a party to the contract, a transferee, or a holder of an interest in the contract."  Colonial Sec., Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc., 461 F. Supp. 1159, 1165 (S.D.N.Y. 1978).  For example, in Colonial Sec., Inc., the district court held that a defendant broker did not breach a contract in failing to pay the plaintiff broker—who was acting as an agent for a disclosed principal—because there was no indication or agreement that plaintiff was a party to the transaction between the disclosed principal and

- 13 -

defendant.  461 F. Supp. at 1166.  Thus, even assuming that Navana was an agent of the principals, there is still no plausible basis for maintaining a breach of contract claim in Navana's name.

Navana has failed to plead a plausible breach of contract claim against TWL, Greenberg, or Israel Discount Bank that meets the minimal pleading standard of Rule 8(a) and its contract claim must be dismissed.

III.     Unjust Enrichment.

Navana alleges that all four defendants have been unjustly enriched by their failure to pay for the goods sold by the suppliers.  An action for unjust enrichment arises from a quasi-contractual obligation "imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved." Bradkin v. Leverton, 26 N.Y.2d 192, 196 (1970).  "The essence of unjust enrichment is that one party has received money or a benefit at the expense of another." Goldman v. Simon Prop. Grp., Inc., 58 A.D.3d 208, 220 (2d Dept. 2008) (quoting City of Syracuse v. R.A.C. Holding, 258 A.D.2d 905, 906 (4th Dept. 1999)).  To establish a claim for unjust enrichment under New York law, a plaintiff must show that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover," Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 55 (2d Cir. 2011) (quoting Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004)); see also Levin v. Kitsis, 82 A.D.3d 1051, 1052-53 (2d Dept. 2011).

Navana does not plausibly plead a claim for unjust enrichment.  First, Navana fails to allege that TWL, Greenberg, or Israel Discount Bank received anything of value from— or because of—Navana.  Ten of the twenty-four containers of goods at issue in this case were

allegedly abandoned by JDE at the Port of Los Angeles. (SAC ¶10).  And, there is no allegation that the other three defendants took possession of those containers.  Navana also specifically alleges that the remaining fourteen containers of goods are affirmatively not under the control of TWL and Greenberg.  (SAC ¶25.)  Nor is there any allegation that Israel Discount Bank has control over them.  JDE is the only defendant mentioned in Navana's complaint for which there are factual allegations demonstrating a benefit received—JDE purportedly controls the outstanding fourteen containers of garments.  Yet still, none of those goods were the property of Navana.

Second, Navana fails to plausibly allege that the three moving defendants, or even JDE for that matter, benefited "at the expense" of Navana.  Navana alleges that the suppliers have not been paid the purchase price for the twenty-four containers of goods they shipped to the United States.  (SAC ¶28.)  And, that Navana "has been damaged by Defendants' unjust enrichment to that [sic] extent that demands have been made for the unpaid goods amount by the shipper/suppliers."  (SAC ¶36).  However, Navana fails to allege any basis for inferring that it had any reasonable expectation of being compensated by the defendants for the goods shipped by the suppliers to JDE.  The defendant who controls the remaining garments may have benefited at the expense of the suppliers, as it is the suppliers' goods they have taken, but there is no reasonable inference from the facts alleged that that defendant benefitted at the expense of Navana—the suppliers' shipping logistics coordinator.  Moreover, the fact that Navana or JDE may have breached some legal duty to the suppliers for which they may be liable to pay damages does not establish that the defendants received some benefit at the expense of Navana.

And, third, without any basis to plausibly infer that TWL, Greenberg, or Israel Discount Bank received any benefit, and did so at the expense of Navana, there is no reasonable

argument that the principles of equity and good conscience support Navana's claim for unjust enrichment, even at this early stage.

Because Navana has failed to plead a plausible claim for unjust enrichment against TWL, Greenberg, or Israel Discount Bank, its unjust enrichment claim is dismissed as to those defendants.

IV.   Quantum Meruit.

Navana also pleads a claim in quantum meruit against all four defendants, but, again, fails to allege facts sufficient to establish a plausible quantum meruit claim.  In order to establish a claim for quantum meruit under New York law, a plaintiff must show: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994) (citing Martin H. Bauman Associates, Inc. v. H & M Int'l Transp., Inc., 171 A.D.2d 479, 484 (1st Dept. 1991). Where a plaintiff pleads both quantum meruit and unjust enrichment claims together, many courts applying New York law have treated the two claims as a single quasi-contract claim.  See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005); State of N.Y. v. SCA Servs., Inc., 761 F. Supp. 14, 15 (S.D.N.Y. 1991).  And, some courts have considered "unjust enrichment [as] a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract." Seiden Associates, Inc. v. ANC Holdings, Inc., 768 F. Supp. 89, 96 (S.D.N.Y. 1991) rev'd, 959 F.2d 425 (2d Cir. 1992) (quoting Black's Law Dictionary (5th ed.)); see also Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 663 (2d Cir.

1996) ("Counts Two and Three for quantum meruit and unjust enrichment were quite properly subsumed by the district court into a single count for restitution.").

As discussed above, Navana has failed to plausibly allege a claim for unjust enrichment. So, to the extent that a claim in quantum meruit is merely the reformulation of an unjust enrichment claim, Navana has not adequately plead a claim for quantum meruit.

Nevertheless, even if the Court examines the specific elements of a quantum meruit claim, Navana likewise fails to allege a plausible claim for relief. Nowhere in its complaint does Navana allege that it performed services for TWL, Greenberg, or Israel Discount Bank or conferred any other benefit on them. Nor does Navana plead that it had any expectation of receiving compensation from those three defendants for any such service. Navana did coordinate the shipping logistics for the suppliers, but only suppliers themselves benefitted from that service. And, the only parties Navana could reasonably expect compensation from for their work in this transaction were the suppliers. There is no basis in fact to reasonably infer that TWL, Greenberg, and Israel Discount Bank were parties to any contract or quasi-contract with Navana—there is simply no evidence of any transactional relationship at all between the movants and Navana. Navana's claim for quantum meruit against TWL, Greenberg, or Israel Discount Bank cannot survive defendants' motion to dismiss.

V.   Account Stated.

The final claim asserted against all four defendants is a claim for account stated. A claim for account stated assumes the existence of "an agreement between the parties to an account based upon prior transactions between them." LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 64 (2d Cir. 1999) (quoting Chisholm-Ryder Co. v. Sommer & Sommer, 70 A.D.2d 429, 431 (4th Dept. 1979)) (internal quotations omitted); see also M.

<u>Paladino, Inc. v. J. Lucchese & Son Contracting Corp.</u>, 247 A.D.2d 515, 516 (2d Dept. 1998)

("An account stated assumes the existence of some indebtedness between the parties, or an

express agreement to treat the statement as an account stated.").  To establish a claim for account

stated under New York law, "the plaintiff must plead that: '(1) an account was presented; (2) it

was accepted as correct; and (3) debtor promised to pay the amount stated.'"  <u>IMG Fragrance

Brands, LLC v. Houbigant, Inc.</u>, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (quoting <u>The Haskell

Co. v. Radiant Energy Corp.</u>, 05 cv 04403 (DLI) (MDG), 2007 WL 2746903, at *12 (E.D.N.Y.

Sept. 19, 2007)).  An agreement to pay may also be implied if "a party receiving a statement of

account keeps it without objecting to it within a reasonable time or if the debtor makes partial

payment."  <u>LeBoeuf</u>, 185 F.3d at 64.

   Nothing in the SAC can be reasonably construed as an agreement for payment of

any kind between Navana and the defendants.  Navana does allege that there is an outstanding

debt between JDE and the suppliers: JDE allegedly owes the suppliers the cost of the shipped

garments—$1,175,063.59.  (SAC ¶¶28-30).  But, there is no plausible basis to infer that the

unpaid purchase price of the goods represents an account stated between Navana and any of the

defendants.  Regarding the transaction at issue, Navana was responsible only for coordinating the

shipping logistics for the various suppliers.  That does not, absent facts alleging some special

arrangement between the parties, entitle Navana to receive payment on the basis of a debt owed

by the buyer to the seller.  Nor does it obligate TWL, Greenberg, or Israel Discount Bank—other

logistics and finance middlemen hired by the buyer—to pay a commercial debt owed by JDE.

   Under the "Account Stated" section of the SAC, Navana alleges that, "as freight

forwarder nominated by TWL, [it] arranged for the issuance of the subject bills of lading on

behalf of TWL at the request of JDE . . . [made] through its agent, TWL."  (SAC ¶41.)

Presumably this amounts to Navana alleging that these bills of lading are a payment agreement between itself and the defendants.  But, the pleading does not "show[]" facts permitting the Court to infer that the "subject bills of lading" represent a statement of account between Navana and the defendants or a debt owed by defendants to Navana.

As noted above, a bill of lading commonly "records that a carrier has received goods from the party that wishes to ship them, [] states the terms of carriage, and serves as evidence of the contract for carriage."  Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 18-19 (2004). They also could act as "[a] formal receipt and acknowledgement that goods of a certain kind, quantity, and condition have been handed over for shipment" or as "[a] document of title to the goods themselves which enable the shipper to sell them by endorsement and delivery of the bill of lading."  T. Schoenbaum, § 10-11.  Based on the facts alleged, the various bills of lading referenced by Navana are reasonably understood to be a carriage contract between Navana and the suppliers or a receipt for, or documents of title to, the actual garments shipped.  In either case, the bills of lading are not, even under a generous reading of the SAC, a contract for payment between any of the defendants and Navana or recognition of a debt owed by any of the defendants to Navana—Navana never sold goods or services to any of the defendants.

Navana's account stated claim against TWL, Greenberg, or Israel Discount Bank must be dismissed.

VI.    Fraud.

Navana alleges that Greenberg, the owner of TWL, is liable to it for fraud because Greenberg advised Navana in writing that the goods in the fourteen unaccounted for containers were "in a safe warehouse under TWL's control," even though they were actually, "upon

information and belief," released to JDE and/or JDE's customers.  (SAC ¶¶ 25-26).  This claim fails to survive.

To state a claim for fraud under New York law a plaintiff must allege "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff."  May Dep't Stores Co. v. Int'l Leasing Corp., 1 F.3d 138, 141 (2d Cir. 1993) (quoting Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970-71 (2d Cir. 1987)).  A plaintiff must also "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent" in order to satisfied the heightened pleading standards of Rule 9(b).  Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).  And, there must be allegations of fact giving "rise to a strong inference of fraudulent intent."  Id.

There are three critical deficiencies with Navana's fraud claim against Greenberg. First, assuming *arguendo* that Greenberg's allegedly false statement about the location of the 14 garment containers was material, Navana does not allege "where and when" Greenberg made his statement.  Rule 9(b) requires, among other things, that a plaintiff specifically allege "where and when" a defendant made allegedly fraudulent statements.  Id.; see also Novak, 216 F.3d at 306. Navana claims that Greenberg made false written representations advising Navana that some of the garments were in a safe warehouse under TWL's control, but does not allege any other specific information regarding the statements, which are necessary to fulfill the pleading requirements for a fraud claim.

Second, Navana fails to allege any facts giving rise to a "strong inference" of Greenberg's fraudulent intent.  "In this Circuit, a complaint may establish the requisite "strong inference" of fraudulent intent either (a) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness, or (b) by alleging facts to show that defendants had both motive and opportunity to commit fraud."[4] Stevelman, 174 F.3d at 84. Regarding motive and opportunity, "[m]otive would entail concrete benefits that could be realized by one or more of the false statements and . . . . [o]pportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994). The SAC includes no factual content showing that Greenberg or his company, TWL, benefitted or hoped to benefit in any way from the alleged fraud—telling Navana that they controlled the 14 containers of garments when in fact they did not.

Regarding, strong circumstantial evidence of conscious misbehavior or recklessness, Navana must allege, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care," Novak, 216 F.3d at 308 (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)) (internal quotation marks omitted), or "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements," Novak, 216 F.3d at 308. Again, the SAC fails to allege facts giving rise to an inference that Greenberg actually deceived Navana or had reason to believe the information he gave to Navana was false.

In attempting to plead fraud, Navana only repeats the basic elements of a fraud claim: it states that "Greenberg made the false written misrepresentations to Plaintiff that the goods were located in a warehouse under his control knowing same to be false." (SAC ¶27). It then claims that "[u]pon information and belief, the goods were released by TWL and

---

[4] While "recitation of the pleading standard for scienter is most familiar in the context of securities fraud, [] it applies with equal force whenever fraudulent intent must be pled under Rule 9(b)." Stamelman v. Fleishman–Hillard, Inc., 02 cv 8318 (SAS), 2003 WL 21782645, *6 n. 4 (citing Ouaknine v. MacFarlane, 897 F.2d 75, 79–80 (2d Cir. 1990)) (internal citation omitted).

Greenberg." (SAC ¶25). Those allegations do not amount to strong circumstantial evidence of conscious misbehavior or recklessness. Even if it were true that Greenberg gave Navana the wrong information about the containers, no facts are alleged supporting the inference that he did so knowingly. Allegations made "upon information and belief" are not sufficient to establish a strong inference of fraudulent intent. See Acito, 47 F.3d at 52 (internal quotations omitted) ("[W]e must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations.").

Third, Navana fails to adequately allege that it detrimentally relied upon Greenberg's purportedly false statement. Navana simply asserts the conclusion that "Plaintiff did reasonably or justifiably rely upon such intentional misrepresentations." (SAC ¶45). It does not allege how or in what way it "reasonably and justifiably" relied. For example, Navana does not allege it was required to take any action, that it took any action, or that it held any remaining duty regarding the fourteen containers, which depended on Navana knowing their truthful location. Navana does allege that it notified the suppliers and their bank about the status of the other 10 garment containers, which JDE left in a General Order Warehouse, (SAC ¶12), but alleges nothing about notifying the suppliers regarding the 14 garment containers at issue.

Nevertheless, even if the Court assumes that Navana did in some material way rely on Greenberg's statement, Navana still fails to adequately allege how its reliance caused any injury to it. Navana simply alleges the conclusion that "Plaintiff has been damaged and has been forced to expend monies to remedy the damage." (SAC ¶47). Navana does assert, under its "Wrongful Dishonor of the Letters of Credit Claim," that the suppliers "are looking to Plaintiff for payment for the goods," (SAC ¶ 53), but it does not allege how that circumstance was caused by Navana's misinformation as to the whereabouts of the fourteen containers at issue.

In sum, Navana fails to allege a plausible fraud claim and the claim must be dismissed at this stage.

VII.    Negligent Misrepresentation.

Alternatively, Navana alleges that Greenberg negligently made false representations regarding where the goods were being stored.  (SAC ¶49).  This claim also fails to survive a motion to dismiss.

To establish a claim for negligent misrepresentation under New York Law a plaintiff must show that:

> "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."

Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

As an initial matter, Navana fails to adequately allege that Greenberg and Navana shared a "special relationship," which would impose a duty on Greenberg to give Navana correct information.  "Liability for negligent misrepresentation may be imposed 'only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011) (quoting Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996)).  Experienced parties operating independently of each other in an arm's length transaction who have no existing affiliation do not share a "special relationship," even if one of the parties possess certain documentation relating to the transaction. See Amusement Indus., 786 F. Supp. 2d at 779 (collecting cases).  The SAC demonstrates that

Navana and Greenberg/TWL are exactly that: independent parties operating on opposite sides of a transaction with no pre-existing relationship or any other reason to repose special trust in one another.

Yet, even assuming *arguendo* that Navana and Greenberg/TWL shared a "special relationship," Navana's negligent misrepresentation claim fails for one of the same reasons its fraud claim failed: Navana does not plausibly allege its detrimental reliance on Greenberg's alleged misrepresentation of the location of the fourteen containers of goods.

VIII.   Wrongful Dishonor of Letters of Credit.

Navana's final claim is for wrongful dishonor of letters of credit against Israel Discount Bank.  A commercial letter of credit "is a common payment mechanism in international trade that permits the buyer in a transaction to substitute the financial integrity of a stable credit source (usually a bank) for his own."  Alaska Textile Co. v. Chase Manhattan Bank, N.A., 982 F.2d 813, 815 (2d Cir. 1992).  Generally, a letter of credit transaction involves three separate and independent relationships:

> (1) the underlying contract for the purchase and sale of goods between the buyer ("account party") and the seller ("beneficiary"), with payment to be made through a letter of credit to be issued by the buyer's bank in favor of the seller; (2) the application agreement between the bank and the buyer, describing the terms the issuer must incorporate into the credit and establishing how the bank is to be reimbursed when it pays the seller under the letter of credit; and (3) the actual letter of credit which is the bank's irrevocable promise to pay the seller-beneficiary when the latter presents certain documents (*e.g.,* documents of title, transport and insurance documents, and commercial invoices) that conform with the terms of the credit.

Id.  Letters of credit are attractive commercial devices, particularly in international transactions, because of the simplicity of compliance and certainty of payment they provide, which derives directly from the three independent contractual relationships described above.  Id.; see also

<u>Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.</u>, 707 F.2d 680, 682 (2d Cir. 1983) (noting that banks regularly issue letters of credit because they are simple in form and because their absolute duty to pay is entirely dependent on the beneficiary's strict compliance with the requirements of the letter of credit).

All parties to a letter of credit "deal in documents, not in goods, services, and/or other performances to which the documents may relate." <u>Alaska Textile Co.</u>, 982 F.2d at 816. To receive payment on a letter of credit, a beneficiary must present certain documents to the bank that "conform with the terms and conditions of the credit issued on its customer's [the buyer's] behalf." <u>Voest-Alpine</u>, 707 F.2d at 682.  Only if the beneficiary's documents conform exactly to the terms and conditions will it receive payment from the bank. <u>Id.</u>; <u>see</u> <u>also</u> <u>Alaska Textile Co.</u>, 982 F.2d at 816 ("There is no room for documents which are almost the same, or which will do just as well.").  Issuers of credit are held to the same demanding standards. <u>Alaska Textile Co.</u>, 982 F.2d at 816.  If the beneficiary's documents "do comply with the terms of the credit, the issuer's duty to pay is absolute, regardless of whether the buyer-account party complains that the goods are nonconforming." <u>Id.</u> To that end, "the bank's payment obligation to the beneficiary is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction. <u>Voest-Alpine</u>, 707 F.2d at 682.

Navana alleges that Israel Discount Bank issued letters of credit on behalf of JDE regarding JDE's transaction with the various garment suppliers. (SAC ¶20).  Those suppliers were the beneficiaries of the letters of credit. (SAC ¶20).  Navana further alleges that Israel Discount Bank refused to make payment on the letters of credit, despite proper presentment of those letters. (SAC ¶52).  Navana asserts that it is entitled to bring this claim for wrongful

dishonor of the letters of credit because "it stands in the shoes of the suppliers," (SAC ¶20), and because the suppliers are seeking payment for the goods from Navana, (SAC ¶53).

Navana has not plausibly alleged that it was injured by reason of the wrongful dishonor of these letters.  As the issuing bank, Israel Discount Bank's "payment obligation to the beneficiary is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction."  Voest-Alpine, 707 F.2d at 682.  Navana, however, is not the beneficiary of the letters of credit issued by Israel Discount Bank; the suppliers are the beneficiaries.  (SAC ¶20).  Ion conclusory fashion, Navana alleges it "stands in the shoes" of the beneficiaries because the suppliers are purportedly suing Navana regarding this transaction.  But, a claim that a person or entity contributed to a loss does not make Navana a beneficiary to the letters of credit or otherwise give it standing to sue for their proceeds.  At best, this is a disguised and defective contribution or indemnity claim by Navana against other who it believes caused the loss.  See Kools v. Citibank, N.A., 872 F. Supp. 67, 72 (S.D.N.Y. 1995) (holding that an undisclosed principal has no standing to sue on a letter of credit); Ahmed v. Nat'l Bank of Pakistan, 572 F. Supp. 550, 553-54 (S.D.N.Y. 1983) (holding that plaintiff had no standing to sue on letter of credit where plaintiff claimed that as agent of the beneficiary it "stood to benefit from the transaction underlying the letter of credit"); see also MSF Holding Ltd. v. Fiduciary Trust Co. Int'l, 435 F. Supp. 2d 285, 303 (S.D.N.Y. 2006) aff'd on other grounds, 235 F. App'x 827 (2d Cir. 2007) (holding that a parent corporation is not the real party in interest capable of seeking payment under a letter of credit assigned to a subsidiary).

Beneficiaries of letters of credit may transfer their credit or assign their rights to proceeds from the letters of credit to another party, in which case the assignee or transferee becomes the only party entitled to the proceeds.  MSF Holding, 435 F. Supp. 2d at 296-97.  But,

Navana does not allege that the suppliers ever assigned or transferred their rights to the letters of credit to Navana.  These letters of credit represent a contract between Israel Discount Bank and the suppliers, which is totally independent of the underlying transaction, and, as a non-party to those letters of credit, Navana has no plausible claim for wrongful dishonor.

Moreover, even if Navana was somehow the beneficiary of the letters of credit, Navana still fails to plausibly allege that it, or the suppliers, presented documents strictly conforming to the terms of the issued letters.  First, Navana fails to allege the terms and conditions of the letters.  And, second, Navana does not plausibly allege that, whatever the terms and conditions are, they were fulfilled.  Navana asserts only the conclusion that suppliers properly presented the letters, (SAC ¶52), which, notably, is not the same as properly presenting the documents required by the letters—presumably, those documents were the original house bills of lading Navana claims were never presented.  (SAC ¶21).

IX.    Amending the Second Amended Complaint.

In its Memorandum in Opposition to Defendants' Motions to Dismiss, Navana requested that, in the event the Court finds the SAC deficient, the Court grant Navana leave to further amend its complaint.  Navana has already amended its complaint twice.  Navana first amended its complaint to correct deficiencies of subject matter jurisdiction raised by the Court *sua sponte*.  It then amended its complaint a second time in response to arguments for dismissal raised in two pre-motion letters submitted by TWL, Greenberg, and Israel Discount Bank. Navana then received the defendants' motions to dismiss in full, which highlighted precisely the critical defects in the SAC.  In response, Navana could have laid out for the Court in meaningful detail how it proposed to amend the SAC to address the defects cited by defendants.  Instead, Navana choose to make a blunderbuss request for leave to amend.  With defendants' fully

supported motions to dismiss in hand, Navana has been unable to state in what respect it would amend the SAC to address the deficiencies cited by the defendants.  Rule 15(a)(2) states that a "party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P.  Because Navana has failed to allege how it could remedy the defects in its claims in a Third Amended Complaint, the Court denies Navana's request for leave to amend.

X.      Default Judgment against JDE.

Navana has received a Certificate of Default against JDE as a result of JDE's failure to make an appearance in this action.  (Dkt. 54).  On that basis, Navana has separately moved for a default judgment against JDE for the purchase price of the goods shipped by the suppliers.  (Dkt. 55).  Navana's motion for a default judgment is denied and its claims against JDE are also dismissed because, for the reasons stated above, Navana fails to plausibly allege any claim for relief against JDE.

XI.     Motion to Intervene.

The Intervenors assert that they are the real parties in interest in the present action and, as a result, have moved to intervene pursuant to Rule 24, Fed. R. Civ. P.  Rule 24 allows parties to intervene either as a matter of right or as permitted in the discretion of the Court.  A court "must" permit anyone to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Rule 24(a).  Otherwise, a court "may" permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact."  Rule 24(b).

"To be granted intervention as of right or by permission, 'an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action.'" Floyd v. City of New York, 770 F.3d 1051, 1057 (2d Cir. 2014) (quoting "R" Best Produce, Inc. v. Shulman–Rabin Mktg. Corp., 467 F.3d 238, 240 (2d Cir. 2006)).  A party must fulfill each of those four requirements to be granted intervention as of right.  Id.

Assuming that they filed a timely application and that they—as the sellers of the goods at issue—have shown an adequate interest in the action, the Intervenors motion should be denied because they have not adequately demonstrated that their "interest may be impaired by the disposition of the action." Floyd, 770 F.3d at 1057.  The Court has dismissed all of Navana's claims against the defendants and has denied Navana's motion for a default judgment against JDE.  The Intervenors have not cited any reason, i.e. statute of limitations, why they are unable to bring their own claims as a separate action.  As a result, the Intervenors' interests have not been, and will not be, impaired by the Court's denial of their motion to intervene.  As the Court previously stated, the Intervenors may have a slew of valid claims against each of the defendants and Navana.  Those claims, however, deserve to be adjudicated in their own right and not as an adjunct to defective claims brought by a freight forwarder.  The Court denies the motion to intervene without prejudice to the Intervenors' right to bring a separate action in their own name.

CONCLUSION

For the above given reasons, defendants TWL's, Greenberg's, and Israel Discount Bank's motions to dismiss for failure to state a claim are granted and all plaintiff's claims are dismissed as to those three defendants.  (Dkt. 42, 45)  Because no claims against TWL and

Greenberg survive the motion, TWL's and Greenberg's claims for indemnity and contribution against the other defendants are also dismissed.  In addition, Navana's motion for a default judgment against JDE is denied and all Navana's pending claims against JDE are dismissed. (Dkt. 55).  The pending motion to intervene is also denied.  (Dkt. 64).

> SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
            February 23, 2016